May it please the Court, I'm Robert Jobe and I'm appearing today on behalf of the petitioner Danut Oanea. In preparing for our argument, it occurred to me that this could be a good case for mediation. The reason I say that is that as the government notes in its brief, the petitioner in this case is the beneficiary of a visa petition that was filed by his United While this case has been pending in the Ninth Circuit, a visa has become available, making Mr. Oanea eligible for adjustment of status. If we went through mediation and the government agreed to a remand, this case would be sent back to the immigration judge and it's virtually certain at that point he would be granted adjustment of status. He has his application filed, does he? No, Your Honor. He won't be able to file that application unless this case goes back to the board. If it goes back to the board, then the board would remand this to the judge because he's clearly prima facie eligible at this point and it's a virtual certainty he'd be granted permanent residence. If it doesn't go back to the board and we lose this appeal, then he would be forced to depart the United States and because he's unable to show that he's not worked a single day without authorization while his asylum application has been pending, he'd be barred from returning for a 10-year period. So we think the just result here would be certainly an attempt at mediation to see if this case could be sent back to the immigration judge. In any event, it's our view, even if mediation didn't work out, that remand in this case is necessary because the immigration judge simply didn't apply the correct legal standards when he evaluated this case a second time. When this case was before the Board of Immigration Appeals the first time, the board found that he's a victim of past persecution. At that point, the government then had the burden of at that point two presumptions arise. It's presumed at a minimum that he has a well-founded fear of persecution. The government can rebut that presumption in two ways. It can demonstrate that there's been a fundamental change in circumstance such that he no longer has a reasonable fear or it can demonstrate that he could safely relocate to some other part of, in this case, Romania, and that it's reasonable to expect him to do so. Now, in this case, the judge focused on that second issue, whether it's possible for him to safely relocate to some other part of Romania. But in doing so, he misapplied the standard. Most significantly, he never addressed the second prong of the test. To rebut the presumption that arises under this, you know, relocation issue, the immigration judge has to make two findings. First, he has to make a finding that the individual could safely relocate to some other part of the country. But second, he also has to make a determination that it's reasonable under all the circumstances of the case to expect him to do so. In this case, the immigration judge found, we think, applying an incorrect burden of proof, but he found that Mr. Iwania could safely relocate, but he never even addressed the second prong of the test. That alone requires a second prong of the test. Kennedy. I mean, what's to address? I mean, is there any reason why he couldn't reasonably relocate or couldn't be expected to relocate? If he could move thousands of miles to the USA, not that hard to think he could move a couple hundred miles elsewhere in Romania. Well, obviously, it's not up to this Court to evaluate that in the first instance, although you may be inclined to do that. That's not your role. But more importantly, yes, there are factors. I mean, first and foremost, he had family here in the United States, his brothers here. He's got no family in any other part of Romania. Secondly, if you look at the 2000 or the 1994 country profile that the immigration judge relied on the first time, it characterizes the Romanian economy as dismal. The American economy is much better. Obviously, his chances are better. Well, that's not really accepted as a reason for letting people into this country. The fact that our economy is stronger than somebody else's isn't usually taken to be a reason for letting them in. No, but you're wrong on that, because the issue then is whether or not it's reasonable for him to have relocated. If it's a dismal economy and he's unable to find work in any other part of the country, that's a factor that the immigration judge would have had to consider. But he didn't consider any of these factors. For example, Mr. Oanaia testified that his record, his government file, would preclude him from finding, you know, good employment in Romania because he got low marks after his brother defected from the country. That affects his ability to find work. And it may be a factor that the immigration judge could have and should have considered. The bottom line here, Your Honor, is that he didn't consider any of these factors because he didn't realize that there's a second prong to this test. And that alone requires a remand. Mr. Joe, the judge also addressed in the decision the fundamental change issue by the question of whether or not it's reasonable for him to have relocated to Romania. And he did not quote from his prior opinion. Why doesn't that work as a finding on that issue for purposes of ---- Well, for two reasons, Your Honor. I mean, first, we don't think that that quotation was intended to be incorporating that earlier finding, because obviously that earlier finding was based on an altogether different record and there was a lot of evidence sphere. It has to do so on an individualized basis. And all this quote says is that the situation in Transylvania has improved significantly since 1990. Well, that's not any sort of individualized finding. And it's true that the situation generally between Romanians and ethnic Hungarians in Transylvania may well have improved, but that says nothing about the ability of this particular individual to live in Romania. Because what's particular about this guy, it's not just that he's an ethnic Romanian, but for whatever reason, this Hungarian political party somehow identified him as a member of this rabid nationalist organization, the Vatra Romanescu, and it identified him as being personally involved in the rioting that took place in 1990 between, you know, where there were 6,000 people involved. They identified him as being personally involved, personally responsible in part for that rioting. So the issue is, can this particular guy have conditions improve for this particular guy? And Judge Simpson never addressed that. All he did was talk about conditions generally having improved, and he gave no individualized analysis as to whether those conditions affect this person. And at that point, he erred. Well, what requires the individualized analysis? A slew of cases from this Court, Your Honor. This Court has consistently required that in order for the government to rebut that, the presumptions that arise, it has to engage in an individualized analysis. It can't rely on general improvement. Borja is probably one of the leading cases, an en banc case to that effect. But it has to evaluate the individual circumstances of the applicant. Now, the judge erred, I would say, in one other way in this case. You know, going back to this issue of whether the Petitioner could safely relocate, it's clear the government has the burden on that question. But if you look at Judge Simpson's discussion here, and this is on page 63 of the administrative record, he says, you know, in this particular case, it is incumbent upon the government to rebut the threat of past persecution. But then his analysis, and this is in the middle of the page on page 63 here, he says, in this particular case, based on the background information submitted by the Respondent, I continue to believe and to find that this Respondent was, never was, and is not now at risk countrywide in Romania. I will once again deny his application for asylum as a matter of fact, but I will say that in this Court's opinion, he never has established, and I do not think he ever will, that he is at risk of countrywide persecution. That's not the test. Obviously, he can't put the burden back on the Petitioner because the burden rests with the government. It wasn't up to Mr. Oana to establish that he is now at risk of countrywide persecution. It's the government's burden to prove that he isn't. He made three critical legal errors here. Each of these require remand. Remand is the just result. If this case goes back on remand, it's not coming back to you. It's going to go to the judge. This guy is going to be eligible for a green card. It's the proper thing to do under the law. I'll reserve the balance of my time. May it please the Court, I am Stacey Young for the United States Government. In this case, the record does not compel the conclusion that the government failed to rebut the presumption that Petitioner has a well-founded fear of persecution were he to return to Romania. Specifically, the immigration judge reasonably found that changed country conditions in Romania related to the eased tensions between Romanians and Hungarians means that Petitioner would no longer have a well-founded fear of persecution. And additionally, he reasonably found that Petitioner could reasonably relocate to another part of Romania to avoid any future persecution. As for the first issue, the record does not compel the reversal of the immigration judge's finding that there have been fundamental changes in Romania such that Petitioner no longer has a well-founded fear of persecution. As the immigration judge discussed, Petitioner's native Transylvania does have a long history of ethnic tensions between Romanians and Hungarians. The board, in fact, found that Petitioner was the victim of this tension in the early 90s in a part of Transylvania that experienced some of the worst ethnic conflicts. However, Transylvania is far safer than it was in the early 90s when the country was in turmoil after the fall of communism. And plenty of evidence in the record supports this. The immigration judge said — Let me ask you to focus, if you could, on, at least at some point, on the argument being made by Petitioner that, in fact — excuse me — that there really was — I mean, there's, I think, some question as to whether there was a finding to that effect in the immigration judge's second decision. Was he actually finding it contemporaneously, or was he setting the stage by describing what had happened before in relating his previous decision? And then the second part of the challenge, I think, as to whether — excuse me — whether the proper standard is being applied and the burden is properly put on the government on that issue. As to your first point, the immigration judge did consider all of the testimony. He made clear that his decision was based on the entire record. He said that explicitly, and he also stated that the Court will consider any new facts that have been presented. And in support of that, he did cite to new testimony. He cited to Petitioner's mother's letter, which stated that she or his family have not been in danger since 1992. Also, he cited — he stated specifically that there's no evidence that the prominence of the two parties, which Petitioner claims to be in danger of, would endanger him or anybody. The judge found that there's no evidence that the police wouldn't help him if there was any problem. He found that there's been no incident with regards to his family since 1995, that his parents have continued to reside in the same home, and that since 1990, country conditions have indeed improved. He made extensive arguments to this effect. So I don't think that there's any real viable argument here that the immigration judge didn't consider the entire record. Kennedy, did he really say country conditions have improved? He seems to be saying I was right the first time and I'm still right. He did rely on part of his opinion from 1995. But in addition, he did discuss changed country conditions since 1995. Where did he discuss that? On page 60 of the record, he cites to a report Petitioner submitted in 2003, which states, besides the violent outburst of 1990 in Tirgu Mures, which is the location where Petitioner was persecuted in 1990, the region was peaceful. He states that there was ethnic violence in Transylvania before, in the early 90s, but that it has improved. He also states on 59, really 59 through 61, that conditions in Romania have significantly improved. And there really can be no doubt that either of the two parties to which Petitioner cites would have any reason to target him for persecution. Is that the report described as 11A? That's correct. That report can be found on page 168 of the record, and it's a new report that Petitioner has submitted, and it's been the most proferent entity record since the 1995 hearing. How do you respond to the fact that he consistently states that it's really the Petitioner's burden? This is on page 63 in a couple of places, that the Petitioner has not brought forth adequate evidence. That's not the Petitioner's burden, is it? That's absolutely correct, it's not the Petitioner's burden. However, in this case, the government did rely on the volumes of evidence that the Petitioner did proffer to make its own argument that conditions in Romania have changed since the time Petitioner was persecuted, and also that it would be reasonable for him to relocate. In this case, the government sometimes does proffer its own evidence. Most often, it proffers State Department reports. But in this case, Petitioner really made out the government's case for it by proffering a large amount of evidence that clearly demonstrates that conditions in Romania have improved. The only testimony, the only evidence, in fact, in the record that Petitioner would be in any danger is Petitioner's own testimony. And what the government did during the hearing was point to Petitioner's testimony, point to the country reports in the record to make out its own case that country conditions have improved and also that Petitioner could relocate. And I can point to some specific examples that the government made during the hearing, if you'd like. But what about in the legal problem? Ordinarily, if the burden of proof is placed on the wrong side, although there may be enormous evidence on one side, if we can't say that the immigration judge applied the right standard, can we uphold what he did? Well, the immigration judge did state that the burden of rebutting the presumption of a well-founded persecution was on the government. Then it proceeds to keep saying that Petitioner did not adequately present his case. As I read the two briefs, yours and the Petitioner's, both of them good briefs, they were kind of passing in the dark. One talks about the burdens of proof, and you talk about the evidence, and they never quite hit. As I mentioned, the immigration judge did get the burden situation correct by saying that the burden was on the government. And then he went on to find that the evidence simply doesn't support the fact that country conditions haven't improved or that Petitioner couldn't reasonably relocate. He may have ---- He puts it in terms that the Petitioner has not presented sufficient evidence. Well, in this case, what happened was that the government used Petitioner's own evidence to make out its own case. And while the immigration judge may have said the Petitioner ---- In that case, it may appear that the burdens were reversed. But the bottom line is, is that the immigration judge did correctly find that there's no well-founded fear here. The government did make out its case. And while there may be some slightly confusing language in the actual opinion, the evidence and the opinion as a whole do clearly demonstrate that the government did meet its burden of proof. Let me ask you, there's been a suggestion that mediation could be helpful. Is the government inclined to agree that we should refer this to mediation? Your Honor, I only learned about this mediation suggestion this morning. So what I'd have to do is consult with DHS to see what their position would be. I'm not in the position at the moment to answer that. How long would that take? I suspect it won't take too long. I could contact ---- If we withheld submission for a week or ten days, for example, to wait to hear of the parties that agreed upon mediation, would that give you enough time to find out? I suspect it would. What I can do is contact the office today, in fact. Okay. If the two of you could just figure out, and we don't need to know how it comes about, but either if we can advise that mediation is agreed to, and if so if you want to be referred to our circuit mediation office or let us know that there is not an agreement either way, I think we'll withhold submission of the case for a week to give, if that's going to be enough time for the two of you to give you a chance to let us know about that. I think that should be fine. I didn't mean to divert you from your argument. Go ahead. In conclusion, Your Honors, the record overwhelmingly supports the conclusion that conditions in Romania today are such that Petitioner would not face persecution anywhere in the country if he were to return. The government did satisfy its burden of establishing both that country conditions have changed and that Petitioner could reasonably relocate. Because the evidence does not compel a contrary finding, the petition for review should be denied. Thank you. These cases are always a bit troubling in that this hearing was not today before the IJ, and we don't know what conditions are. They may be lovely today or there may have been another change. That's correct. The last, the only evidence we have, the most current evidence is from 2003. Yeah, that's right. Thank you. Thank you. Mr. Jobe. I guess we just disagree on how to read this immigration judge's decision. I mean, I would direct the Court to the first page of the immigration judge's decision. It's on page 55 of the record. You know, the judge says, This Court perceives no reason to change its findings of fact. The Court will concede, however, that those findings of fact have been interpreted in a fashion by the Board of Immigration Appeals to indicate that the respondent has a well-founded fear as a result of those facts. The judge said something very similar on the record at the hearing. This is on page 75 where, you know, in characterizing the immigration judge's decision, he says they, the Board, accepted his testimony and they have concluded that he has a well-founded fear. I mean, throughout the judge's opinion, he seems to assume the existence of the well-founded fear. His focus is on relocation. That's the focus of his decision. That's the basis of the decision. And on that point, without question, he erred. He put the burden of proof on the Petitioner, not on the government. For that reason, the case has to go back. Thank both parties for their argument. We will defer submission of the case, actually, since next Monday is a holiday, until Tuesday of next week, the 20th, and ask the two of you to notify us by that date if the case should be deferred further to be referred to mediation. Thank you. We'll proceed to the next case on this morning's calendar, Kassler v. Bressler.
judges: B. Fletcher, Clifton, Ikuta